March 17.
Judge Green,
delivered Ms opinion.
Theodorick Morrison died intestate, leaving his wife, Mary, and three infant children, by the said Mary, surviving him. Two of those children died intestate, under age, and unmarried, leaving their mother, Mary, and sis- *356 ^er’ ^nn Morrison, an infant, their distributees. Mary intermarried with Stith Gregory; and, on the 11th day of December, 1804, said Gregory and wife exhibited their bill, in the county court of Prince George, against Beter Bland, administrator of Morrison, and Ann Morrison, claiming a partition of the slaves of Morrison’s estate, and an assignment of the dower of the plaintiff, Mary, therein. The infant defendant, Ann, by her guardian ad litem, the said Peter Bland, answered, and submitted her interests to the court. Bland, the administrator, answered, and declared, that he would not urge any objection to the decree, (sought by the bill,) if the complainants would execute to him a bond, with good security, for 1291. Ss. 6d. due to him by the female plaintiff, for purchases at his intestate’s sale, and execute to him a refunding bond, with good security, agreeably to law. On the same 11th day of December, 1804, the court pronounced a decree, appointing James Cureton, Thomas Cocke, Edward Marks, jr„ and James Dunn, or any three of them, 44 to divide the 44 negroes belonging to the estate of Theodorick Morrison, 44 into three equal parts j” and, “ that they allot one equal 44 part to the said Stith Gregory, and Mary, his wife, in « fee simple; and, the remaining two parts, to Nancy 44 Morrison, the defendant, subject to the widow’s dower, 44 in the. said slaves, which the said commissioners will 44 first allot to the said S. Gregory, and Mary, in right of 44 said Mary, for and during her life. And, it is further 44 adjudged, ordered, and decreed, that Stith Gregory 44 should execute bond and security to Bland, for the 129Í. 44 5s. 6d.; and that Stith Gregory should execute to Bland 44 the usual refunding bond, with security. And, if the 44 negroes could not be equally divided in kind, the com-44 missioners were to sell such as might be necessary to 44 equalise the division, and assign the bonds, in due pro-44 portion, to Gregory and wife, and Ann Morrison.”
It seems, that the residence of S. Gregory and his wife, was at a plantation belonging, in her own right, to Mrs, *357 Gregory, and on which Theodorick Morrison had lived : "i * that, when the aforesaid decree was made, the negroes of Morrison’s estate had been hired out by Bland, the administrator, for the year 1804 : that, at the end of the year, they were collected by Gregory, at his plantation $ and, on the first day of January, 1805, three of the commissioners attended there, and, in the absence of Bland, and without any notice to him, as far as appears, proceeded to execute the said decree, and assigned Phillis, and her five children, Dick, Billy, James, Mary, and Winney, Robin, old Frank, jun., old Peter, and Milly, to Gregory and wife, in fee simple, being a third part of the negroes | and assigned as the dower of Mrs. Gregory, Letty and three children, Bob, Jack, Ned, and Rico. And the said commissioners, James Cureton, Edward Marks, jr. and James Dunn, signed reports to that effect. But, the same were not returned to the court.
The commissioners made no formal delivery of the slaves so assigned to S. Gregory, but left them in his possession, (to use the expression of Dunn, one of the commissioners, who was examined as a witness in this cause,) and Stith Gregory claimed and held them as his own, and they were considered as his by the said Dunn, as long as Gregory lived, and he proposed to sell some of them. And he continued thus, to hold and use them as as his own, until the time of his death, on the 8th of January, 18061 nor is there any allegation by any of the parties, or a scintilla of proof, that Bland or any other person, made the slightest objection to this division and possession by Stith Gregory, during the life of Gregory. After Gregory’s death, the slaves in question continued under the overseer, under whom he bad placed them, until the end oí the year, 1806. It does not appear what was done with the slaves, assigned to the infant, Ann Morrison, upon the division, nor whether they remained in Gregory’s possession, or were taken possession of by Bland, or any other person. Sylvanus Gregory administered on the es- *358 Gregory; at what time, does not appear. And when the estate of Stith Gregory was appraised, the negroes in question were not appraised, because the overseer, Benjamin Hari’ison, stated to the appraisers, that Blani* had stated to him, that the division was in his opinion, unfair; and that he should move the court for a new division. When this appraisement was made, does not appear, nor whether S.vlvanus Gregory was present; though it is probable that he was. And, upon this statement, the appraisement of those negroes was postponed. But, it does not appear that Sylvanus Gregory abandoned his intestate’s title to the said slaves. But, on the contrary, on the 10th of June, 1807", he exhibited his bill in the county court of Prince George, against Mary Gregory, (who, it seems, then claimed the slaves as ber’s,) and P. Bland, administrator of Morrison, claiming to set up, and have confirmed, the report of division aforesaid, (which was exhibited with the bill, and which had not before been returned to the court.) Mary Gregory answered: and, referring to the answer of P. Bland, she insisted that the slaves in question, (that is, those assigned to Gregory and wife,) belonged absolutely to her; and that her title was clear, after Morrison’s debts w’ere paid; and that Stith Gregory never did consider, that any legal division was made. Bland answered, and objected to the confirmation of the report. 1. Because neither S. Gregory, nor his representative, had executed to him the bonds directed by the decree aforesaid; and that an indemnifying bond was necessary, as claims against Morrison’s estate were in a course of legal prosecution, and insisted upon holding on the said slaves, until he was completely indemnified. 2. Because the division was unjust and unfair, and the most valuable property assigned to Gregory and wife: that the negroes were hired out by him, for 1804 : that a few days before the hiring expired, Gregory, without his knowledge, unlawfully possessed himself of the said slaves, and carried them before the commissioners, and caused them *359 io he divided without his knowledge, in his absence and without notice to him, and when the infant, Ann Mom-son, was not represented : that the report had never been returned: that he would earlier have taken exception to the report, if it had been returned, and had often applied at the office, for a copy of the report; and that the commissioners had long ago, (the answer was sworn to, September 22d, 1807,) been apprised that the report was exceptionable, and in all probability, held it up for reconsideration, and to give him a fair hearing before them, which never took place. During the pendency of this suit, John Marks intermarried with the widow of Stith Gregory, in October, 1809, and entered into a marriage contract with her, in relation to the negroes in question, which were in her possession ; the particulars of which contract, are immaterial in this cause. Three depositions were taken on the part of Marks in this cause: That of William Harrison, who testifies that Stith Gregory gave him no notice of the division; the materiality of this evidence, is not perceived : That of Edward Marks, jr. one of the commissioners, states, that he knows of no notice given to Bland, of the division, that no report of the division was ever returned to court by the commissioners? but that since the death of Stith Gregory, he had seen the report in the hands of Sylvanus Gregory,his administrator : That of James Dunn, another of the commissioners, states, that Peter Bland was not present at the division, nor docs he know that lie was notified, nor that the report of the division was ever returned. Nothing more was done in this suit, and Sylvanus Gregory died in July, 1810.
In September, 1811, William Harrison qualified as administrator de bonis non of Stith Gregory, and on the 8th. day of May, 1812, sued out his subpoena in the Richmond chancery, against Nathaniel Marks, administrator of John Marks, and Peter Bland, administrator of Thomas Morsison, which was duly served. Before the bill was filed. *360 Nathaniel Marks died, and administration de bonis non of J. Marks, was committed to Edward Marks. The bill was filed in July, 1813, against Bland, administrator of Morrison, E. Marks, administrator of J. Marks, and Ann, the then infant daughter of Morrison, stating the original suit, decree, and division aforesaid, and claiming all the negroes mentioned in the said report of division, except Robin, (who was probably dead,) and also the said dower slaves: that the commissioners actually delivered the said slaves to Stith Gregory, and that the division was fair and equal; and prays for discovery of the increase of the slaves, and an account of profits against Marks, the administrator of Marks, who had held the said slaves, and lured them out from year to year. To' this bill, E„ Marks, administrator of J. Marks demurred, because, if the plaintiff had right, he had a legal remedy; and answered, that his intestate and his representatives, had been in possession of the slaves for more than five years, and insists on the statute of limitations. He denies, that the commissioners delivered the slaves to Stith Gregory, and assigns as a reason for that belief, that the administrator of S. Gregory did not take possession of the negroes j relies upon the pendency of the original suit, (in which no order of abatement had been made,) as a bar to this suit; relies, that P. Bland, the administrator, withheld bis consent to the delivery of the negroes, till a refunding bond was executed : and that the commissioners, therefore, refused to deliver the possession to S. Gregory: that Gregory never did execute the refunding bond: that the complainant immediately after the death of S. Gregory, (when, however, he was not the representative of S. Gregory,) hired out the negroes as the property of Mary Gregory, until her intermarriage with Marks.
Peter Bland answers, and admits the division to have been made, and to have been fair and equal, and waives every exception to it; but. insists upon the payment of the 129k 5s. 6d. with interest; and on such payment being *361 made, but not otherwise, he consents to the prayer of the bill being granted. The defendant Ann Morrison intermarried pending the suit with James Young, and they answered (she being then an infant) objecting to the original division, and to the administrator, Bland, suffering the slaves to be divided in an unusual manner, and to go out of his possession without endeavouring to prevent it, into the possession of those indebted to the estate, without taking from them any security.
A. B. Spooner, attorney for Young and wife, filed a paper signed by him as attorney aforesaid ; waiving in their name all benefit to be derived from the division in this cause, provided, the division made by the commissioners be decreed to stand, and be binding; and stating « it is not their desire to dispute the right of Stith Gregory to the slaves, which lie had in possession.”
In September, 1817, this suit abated by the plaintiff’s death: and in November, 1817, the suit was dismissed, by what authority does not appear, but probably by that of James Young, who had taken administration de bonis non of Stith Gregory, as to James Young and wife : and process to revive against James Young, administrator de bonis non of Stith Gregory, was awarded. There is no order of revival.
The following depositions were taken in the cause : Thomas Cocke proves, that W. Harrison demanded the slaves of E. Marks, jr., in January, 1813.
Benjamin Harrison proves, that Stith Gregory died, January 8, 1806 : that he engaged to live as an overseer for S. Gregory, for the year 1806, removed to the plantation on the 16th of December, 1805 : that he was then in possession of the slaves allotted to him in the division of the 1st of January, 1805 : that he said they were his property, and wished to sell two of them, Mary and Winney, for a particular purpose : that Sylvanus Gregory died in July, 1810: that the negroes remained on the plantation throughout the year 1806 : that the plantation *362 was the property of Mrs. Gregory, in her own right: i that the negroes were not appraised at the appraisement of S. Gregory’s estate ; but that was postponed, because he stated to the appraisers, that Bland had stated to him, that, in his opinion, the division was unfair; and that he should move the court for a new division.
Alfred Wilkins proves, that be hired one of the slaves in question, in 1808, from William Harrison, as agent of Mrs. Gregory.
William H. Harrison proves, that the report of division was not returned to court until June, 1807: that he believes that S. Gregory was in possession of the slaves assigned to him and his wife, and is positive as to one, Mil~ ley: and that the plaintiff demanded of the defendant, Marks, the slaves in January, 1812.
James Dunn, one of the commissioners, proves, that the slaves assigned to Gregory and wife, were left in Gregory’s possession, and remained in his possession, and under his control, 17 or 18 months, and were considered as his property until his death : that the division was made at the plantation on which Gregory resided, and on which Morrison had resided: and that he does not recollect, that the commissioners gave the possession of the slaves to S, Gregory.
Upon the hearing of the cause, the chancellor dismissed the bill, because as Stith Gregory, in his life-time, failed to perform the conditions, on which a division of the estate of Theodorick Morrison was directed by the decretal order of the county court of Prince George, with the assent of the administrator, he had not such a possession of the negroes in question, as to authorise his administrator, to claim them against his wife, who survived him ; because the plaintiff’s remedy, if any, was at law; and because his claim was barred, by the statute of limitations.
From this decree, Young, administrator of Gregory, appealed to this court.
This court has so frequently affirmed the jurisdiction of a court of equity, to entertain a bill for the recovery of *363 slaves, when a discovery of the increase of female slaves, after a considerable lapse of time, and an account of hires and profits of a stock of slaves, where some of them may have been young and chargeable, that I do not consider the question, as to the jurisdiction of a court of equity in such a case, to be open to argument and enquiry. Indeed, some of the cases go so far, as that they can be hardly justified on any other ground, than that a court of equity is the only tribunal, which can give a competent relief, by giving the property in kind, to the party entitled ; which is not effected directly by a judgment in detinue, but can only bo enforced by a distringas, and against an obstinate or insolvent defendant. That remedy would be unavailing, to the purpose of restoring the property to the owner, and a cu. sa. could be resorted to, only upon superseding tiie distringas, arid taking a judgment for the alternate value.
I think, therefore, that the court had jurisdiction. Nor do I think, that the remedy of the representatives of Stitlr Gregory was barred by the statute of limitations. Stith Gregory died the 8th of January, 1806 ; his first administrator died in Juiy, 1810, before the statute of limitations had barred his remedy, since the adverse possession commenced after his death. His second administrator qualified in September, 1811, and instituted this suit, in May, 1812; within one year after his qualification, which was well within the equity of the statute. (a)
It remains, therefore, to examine the merits of the case ; and in doing so, a critical attention to the facts of the case is necessary.
The decree of Prince George county court, of December 11, 1804, did not make the execution of the bond for the 129b 5s. 6d., and the usual refunding bond, a condition precedent to the execution of the decree, in respect to the division and allotment of the slaves. That part of the decree directing such bonds to be given, was substau *364 ^'ve anc^ independent of the rest, and the division might well be made, without regard to it; and the property, if' taken possession of by S. Gregory, in pursuance of the division, might have been subject to the future order of court, if he failed to give the bonds when required to do so by the administrator; or, the administrator might have withheld the possession of the property, until such bonds were given ; but in any of those cases, the partition would ndt have been vacated, and the specific slaves assigned to Gregory and wife would have continued to be theirs; and in whose hands soever they were placed or remained, the hires and profits of the slaves would have been theirs ; and, if any had died, it would have been their loss, if the partition were equal, and finally confirmed. The failure, therefore, to execute the bonds, did not, of itself, vacate the partition, or intercept their right (legal or equitable, it is immaterial which,) to the specific slaves assigned to them. It is true, that whilst their perfect right to an undivided portion of the slaves, could not have been affected by any after-proceedings in the cause, their inchoate right by the partition to the specific slaves assigned, might have been (for any good cause arising out of the manner or inequality of the partition,) disturbed by the subsequent, proceedings, in the cause, and other slaves assigned to them. This partition was made under such circumstances, that the guardian of Ann Morrison, the infant, might have caused it to be set aside, if he could have shewn it to be unequal or improper in any degree. But, the administrator certainly could not have questioned the partition, merely because the bonds were not given. By virtue of this partition, Gregory took possession of the slaves allotted to himself and wife, in her right, claiming them as his own, adversely to Bland, and all the world; and held and used them as his own, peaceably, and without any objection from any quarter, as long as he lived. Bland acquiesced, without objection or complaint, in any way or to any one, in this partition and *365 possession during Gregory’s life; and never demanded of Gregory to execute the bonds directed by the decree to be given to him by Gregory.
That Gregory held such possession, cannot be questioned. That it was adverse, appears from this, that he claimed and used them as his own, and proposed to sell some of them; and he did not hold them by Bland’s permission, or under any condition, by agreement of Bland : For, Bland says, he acquired the possession wrongfully, and does not pretend, that afterwards any terms were agreed upon as to the continuance of the possession. Bland does not say, nor is there any evidence to shew, that he ever required of Gregory the execution of the bonds $ and it is equally clear that Bland acquiesced in this partition and possession, and considered them rightful and binding during Gregory’s life-time. He does not say, that he had objected during Gregory’s life-time. It is true, he says, that he long since (that is, before September, 1807,) notified the commissioners, that he should object to the division, and had frequently applied at the clerk’s office, for a copy of the report. But, all this might well have happened, consistently with his answer, after Gregory's death ; and the proofs and circumstances of the case prove, that the fact was so. No person, who is examined in the cause, ever heard of any objection until after Gregory’s death. Two of the commissioners are examined; neither of them hints, that he ever heard of any such objection ; and one of them considered the slaves as Gregory’s, as long as he lived. And the conduct of Bland forbids the supposition, that he urged, or even entertained in bis own mind, any such objection. For, whilst be states that Gregory got possession of the slaves from him improperly, and that the division was unjust, and that the bonds were of great importance to him, he took no step to remedy those wrongs before claiming the negroes so improperly taken from his possession and control, or to correct the partition, or to procure the bonds during Gregory’s life-time j *366 all of which might have readily been done in a summary ... . , way by applying to the court. Ills communication to the overseer of Gregory, that he objected to tlie division, and would move the court for a new division, was after S. Gregory’s death. I say so, because such a construction (the time not being ascertained by the deposition,) corresponds with the other facts of the case ; because the overseer was employed by S. Gregory, only a short time before his death; and, until after Gregory’s death, had no doubt but that the negroes were his. I think I am justified in saying, that Bland assented to the partition, and Gregory’s possession, in the life-time of the latter, and until after his death. But, after Gregory’s death, the objections, now insisted on to his title, were first thought of; and, I think, merely for the purpose of securing, if possible, to Mary, the daughter of Gregory, through her mother, the slaves in question. That this was really the object, is verified by the fact, that whilst Bland opposed to the administrator of Gregory his pretended rights and interests, he never took any measure whatever to enforce them, against the property in the hands of Mrs. Gregory. No sooner-do the claims oí Marks interfere with this object, than, for the sake of Gregory’s family, he renounces, in favour of them, all those claims and rights, except the claim for money due him out of the fund in dispute; and swears directly in opposition to his former answer.
And here it ought to be observed, that none of the allegations of the answers in these several causes, can be considered as evidence against the plaintiff, since they are not responsive to the bills, and are unsupported by proof. Thus there is no shadow of proof, to justify the assertion, that the partition was unequal, or in any way objectionable. But, the conduct of all the parties justifies a contrary belief. There is no proof, that the commissioners failed to return the report, because of any objection made by Bland, to the division. On the contrary^ *367 if we believe Bland, ho expected it to be returned; and the paper being in the hands of Gregory’s administrator, and it not appearing to have been procured by him, from any of the commissioners, it is fair to conclude, that the report, when signed, was left by the commissioners in Grcgory’s possession ; which is the usual practice in similar cases. And it was not returned, in consequence of Gregory’s mere negligence, as is common in cases of friendly partitions. It is also remarkable, and verifies the conclusion, that all the objections to the partition, urged since Gregory’s death, were thought of, for the first time after ho died; that when Bland informed the overseer, that he thought the division was unfair, and that he should move the court for a new division, he did not hint that lie had any objection to the division, because the bonds, required by the decree, were not given, but only because the division was unequal; and now he affirms, that the division was equal, and only claims to have a remedy against the negroes, for the 129Z. 5s. 6d.; not insisting even on the refunding bond.
This possession so acquired by Gregory, after his death, came to his widow, by the accident of the slaves being employed upon a plantation which was her’s 5 and, upon her marriage with Marks, came to him, and has passed . to his administrator, uninterrupted either by the claims of Morrison’s administrator, or daughter. This possession has continued in the same right, as it commenced ; for, it is the partition only, which gave any colour of right to hold or claim the specific slaves so assigned either to Gregory or his wife, or her second husband, or his administrator. Nothing has been done to procure to any of them, a new or better right; no compromise with Bland or Ann Morison, or her guardian, or husband, is pretended. Bland's answer to Sylvanus Gregory’s bill, negatives that idea j and Mrs. Gregory in her answer to the same, bill, strongly insists upon a title, not to an undivided portion of the slaves of Morrison, hut to the identical slaves so held by *368 *ier un(*er ^iat division, and claimed by the bill. The declaration in her answer, that Gregory did not consider division as binding, is no evidence; and is not proved, but rather disproved. And now Marks insists for the support of his title upon the same facts, which, if they give any title at all, gave it to Gregory. In short, he claims and enjoys the very title and no other, whether it be good or bad, which Gregory acquired.
Upon this state of facts, the question arises, whether Mrs. Gregory’s interest in the slaves of her former husband Morrison, vested in Stith Gregory ?
I should hesitate long, before I could determine, that the possession of a husband of his wife’s interest, in a subject to which she was entitled, in common with others, under a partition made by virtue of an interlocutory decree, gave him no title, until the report of tiie partition was confirmed, and a final decree pronounced; and that, whether the partition was valid and ought to be confirmed, or objectionable and should be set aside, for any cause; or, whether a condition of paying money for equalizing the partition, were annexed to such partition, or that a bond of indemnity was to be given ; neither of which, may have been paid or given. The consequences of affirming such a principle, would be extensively mischievous. Nothing is more common, than friendly bills and answers, in the county courts, for partition'; and when the partition is made by commissioners, all that is interesting to the parties to be done, being done, no further care is taken by any party, upon the subject. No report is returned, or, if returned, not acted on for years, as the chancery docket, in those courts, is hardly ever called. The parties take the property assigned to them, and rest satisfied. Upon such partitions, money is frequently directed to be paid by one of the distributees to another, for equalizing the partition ; which, as the sums are generally small, and parties nearly connected, is sometimes not paid at all, or paid after a great length of time. In all cases *369 of administration, a refunding bond is of course directed by the decree; but, this is seldom asked by the executor or administrator, or given by the distributee; thecircum- . . . . » - t i r« .. stances ot the estate, not making it desirable. It the husband’s right to his wife’s distributable proportion of a common fund so situated, were suspended, until the decree was made final, and the partition confirmed, (and until that time it is in all cases possible, that the partitions may be varied,) or until he paid the money charged upon her proportion of the property, or gave a refunding bond, as the decree required, then a large proportion of the slave property in Virginia ought immediately to change hands. Purchasers must restore the slaves and their increase, purchased from husbands in such circumstances; creditors must be defeated, and the representatives of the husbands must restore the slaves to the wives, or their representatives. And the statute of limitations cannot avail in such cases; for, whilst the suit slumbers for a quarter of a century, on the county court docket, it protects all rights against the statute of limitations.
The case of Wallace vs. Taliaferro, has no application to this case, further than to ascertain that a husband’s representatives cannot claim against his wife, surviving him, her slaves, unless he has reduced them to possession. Wishart, if he had any possession in that case, had it as executor. As executor only, could he take them in the first instance; and, taking possession in that character, his possession must so continue, until changed by some act, shewing that he elected to hold in his character of husband ; a decision, in strict conformity to the English decisions on that subject. But, in this case, S. Gregory claimed to possess as husband, and had no color of right to possess in any other character.
This title may have been infirm, and liable to be impeached by Morrison’s administrator, or his daughter: but they have never impeached it, by asserting any claim to the property, and now expressly confirm it; and it is *370 not competent to any other, to question it. As against all others, and especially wrong-doers» it was valid, and sufficient to sustain an action of detinue. An actual possession is sufficient for that purpose, (even a naked bailment without interest,) as against strangers, and persons having no shadow of title, and wrong-doers. It is not competent to Mrs. Gregory,’ or her last husband, Marks, to set up the right of Bland and Ann Morrison, which they have abandoned, against the claim of Gregory’s representative ; since Marks claims, or at least came to the possession of, the property, and has heretofore continued in possession of it, under Gregory’s title, such as it was, and no other.
If a wife’s property were in the possession of another, and the husband, instead of proceeding to recover the possession by legal means, were to take it by force of arms, although as a wrong-doer ho would be answerable for his wrong, yet I presume such a possession would vest his wife’s interest in him. If a wife had an interest in common with others in personal property, and the husband forcibly took possession of all, although he would be censurable for such wrong to the other tenants in common, I suppose his wife’s interest would vest in him. If, in the partition of a joint fund, in which a feme covert had an interest, a fraud were practised by or against the husband, or an error be even committed, which would justify the setting aside the partition, and decreeing a re-partition, after the husband’s death, I should suppose that this repartition would be for the benefit of the husband’s representatives. A possession wrongful as to others, may well have the effect of vesting the wife’s interest in the husband.
If it were thought proper to consider the rights of the parties, as they stood at the time of Stith Gregory’s death, such an examination would not vary the result, to which the foregoing view of the case tends. It may be said, that the suit being instituted by husband and wife, in right of the wife, upon the death of the husband, the suit did not *371 abate as to the wife, and could only be prosecuted in her name ; and that the husband’s representative could not, by any means, make himself a party to the cause. To this it * * may be observed, that ii is true, that the representative oí the husband could not be made a party, by a scire facias to revive, or by a mere bill of revivor; yet, if any thing had occurred, which gave the husband a right to the property as against the wife, and the proceedings in the cause were in such a state, that his representative could not avail himself of that right by the ordinary proceedings to revive the suit, he might well avail himself of it, by original bill, in the nature of a hill of review and supplement; which is the precise course pursued in this instance, and a course familiar to the English books of practice; and the necessity of which has frequently occurred in England, in similar disputes, between the representatives of a deceased husband, and the wife surviving him. So that the question, whether the representatives of S. Gregory could avail themselves of the proceedings in the original cause, in aid of his title, acquired by the possession of the slaves in question, depends, not upon the question, whether that original suit could be revived in the name of that representative, but, upon the previous question, whether Gregory had in effect acquired such title. And if, in looking to the rights of the parties, as they were at the time of S. Gregory’s death, it should he thought that Bland’s acquiescence, without objection, in Gregory’s possession, during the life of Gregory, a period of more than a year, was not a sufficient evidence of his virtual consent to the partition and possession of the property; yet, his after-conduct, up to the present time, a period of sixteen years, which has been entirely consistent (I speak not of his inconsistent and contradictory declarations,) with such a presumed assent, and utterly inconsistent with the pretensions set up, but not pursued, by him, after Gregory’s death, may well be resorted to for the purpose of shewing the quo animo (if I. may use the, *372 exPrPSS,’on?) of the acquiescence aforesaid, in Gregory’s life-time.
If the rule of the English chancery, (founded upon the mere practice of the court,) could be considered as the law °f Virginia, (as to which I give no opinion,) to wit, that a court of equity will not assist a husband to get possession of his wife’s equitable interests, unless, upon his making a reasonable settlement upon the wife, I should think that the rule could have no eifect in this case, because the subject is still in the power of the court, so far as to enable the court to make such a provision, if a proper case were made for that purpose. The English decisions are to this effect: That if, before suit brought, the trustee pays or delivers to the husband, as husband, the wife’s equitable fund, the court cannot reclaim it, or subject it in the hands of the husband, or his assignee, to the wife’s equity. If the husband, or his assignee, cannot obtain the fund, without suit, then the wife’s equity attaches upon the property; the extent of which equity depends entirely upon the circumstances of the case, and may not exist at all; as, if the husband had already made an equivalent provision for the wife, and if the trustee puts the husband, as husband, or his assignee, in possession of the fund pending the suit, the wife’s equity follows the property into the hands of the husband, or his assignee. But, it will not divest the title acquired by the possession, except so far as may be necessary to charge upon it a reasonable settlement on the wife, or any legal or equitable right of any other party. The possession of the husband, to give him a title, must be as husband,, and not as trustee or executor. I need not refer to the authorities on these points, which abound in the English books ; but, will refer only to the case in 12 Vesey, mentioned at the bar. There a trustee held the fund, the interest of which was payable to the wife’s mother for life, and, after her death, was to go to the wife. He voluntarily paid the fund to the husband, who agreed to pay, and did pay as long as *373 lie lived, tlie interest to the tenant for life, and his executors paid the interest in like manner, after his death : in a contest between the wife surviving and the representatives of the husband, it was adjudged, that the husband’s representatives had a title to the fund in question.
I think upon the whole, that as Gregory was in actual possession, claiming in right of his wife that possession, whether rightful or w rongful, as to Bland and Ann Morrison, vested his wife’s rights in him, as betw’een his representatives and her husband Marks ; and that Gregory and Iiis representatives, were entitled to all the benefit which should arise from such possession; and in this case, the title was absolute, until it was controverted effectually, by suit, by those who alone had a right to object to it.
If I am right in this, then the original suit in the county court of Prince George, and which abated as to S, Gregory by his death, was no impediment to the prosecution of this suit, since that suit was no longer depending, as to the only party who had a right to claim any relief in it. Nor was it necessary that Mrs. Marks, if alive, or Young and wife, should be parties in this suit, as they have no interest in the only question arising between the representatives of Gregory and Marks; nor can their rights be in any way affected by the division. I should, therefore, be for decreeing the slaves, and their increase and hires to Gregory’s administrator, if he was a plaintiff in the cause. But he is not. The suit has never been ordered to stand revived as to any one; and the process was against, and not in favour of Young, administrator of Gregory. The decree ought therefore to be reversed, and the cause sent back, tlsat it may be properly revived in the name of Young, administrator de bonis non of S. Gregory, against Marks’s administrator; and against Bland, who (although not a necessary party,) being made a party, ought to be paid the debt and interest, which lie claims out of the property in litigation.
*374 Judge Coalter.
It is admitted on all hands, that the slaves belonging to the estate of Theodorick Morrison, and which were in the hands of Peter Bland, his administrator, were to pass, after the payment of his debts, to his three children, subject to his widow’s life-estate in one-third of them ; and that, on the death of two of those, children, she became entitled, as one of their distributees, to one-third of them', in absolute property, the other two-thirds passing to the surviving child, subject to her life-estate in one-third of them. In this situation, the slaves being hired out by the administrator, who had not closed his administration, or made distribution thereof, Mrs. Morrison, the widow, intermarried with Stith Gregory.
Shortly after this event, to wit, in December, 1804, a friendly bill and answer were filed in the county court of Prince George, wherein the rights above stated are alleged in the bill, and admitted in the answer by Peter Bland, the administrator, in that character, and as guardían ad litem of the surviving child, Ann Morrison; and a division of the slaves, according to the claim in the bill, was agreed to by the administrator, on condition, that the complainants would give bond, securing to him the payment of 129l. 5s. 6d., which it was alleged was due to him from the female plaintiff, for purchases made by her at the sale of the said Morrison’s perishable estate, beyond her share of that estate, and would also give a refunding bond to secure the administrator, agreeably to the art of assembly. An interlocutory decree was thereupon pronounced, appointing commissioners to divide the slaves into three equal parts, and to allot one part to Gregory and wife, in absolute property, and the remaining two-thirds to the infant, subject to dower, which they were directed first to allot and set apart to the said Gregory and wife, in right of the wife, during her life. And it was furfher decreed, that Stith Gregory should give bond and security for the 129l. 5s. 6d., and also a refunding bond.
*375 It appears from the testimony in the cause, and the answer of Bland to another bill hereafter to be noticed, that Gregory and wife resided at this lime on a plantation belonging to the wife ; and that (he slaves, subject to the division aforesaid, had been hired out by the administrator, Bland, for the year 1804 ; that they were brought to the plantation aforesaid, by Stith Gregory, and were there brought before three of the commissioners, on the first day of January, 1805. Those commissioners signed a paper of that date, in which they state, that they had, on that day, pursuant to the decree, allotted and set apart to Gregory and wile, one-third of them, in absolute property ; to wit, Phillis, and her five children, Dick, Billy, James, Mary, and Winney ; Robin, old Frank, jun’r., old Peter and Milley ; and had also allotted and set apart to ■them, during the life of the wife, one-third of the residue, naming them.
The division being thus made, the whole of the slaves, as i understand, remained on the plantation, in possession of Gregory and wife, during the year 1805, and until the death of Stith Gregory, which happened on the 8th day of January, 1806.
The commissioners never made a report of their proceedings, probably for the reasons hereafter stated, nor was any thing else done in this suit, until the death of Stitt» Gregory as aforesaid.
Benjamin Harrison, a witness, says, that he was employed by Stith Gregory as overseer, for 1806, and entered into bis service in December, 1805. He is asked, if Gregory was then in possession of the slaves allotted to him in right of his wife under the decree aforesaid, and whether he exercised ownership over them. He says, he was in possession of them, and said they were his property, and wished to sell two of them, to wit, Mary and Winney; that Stith Gregory died in January, 1806, and that the negroes remained on the plantation, during the year 1806, without interruption.
*376 Sylvanus Gregory, it appears administered on the estate of Stith Gregory, but at what time is not shewn. But, these slaves were not taken possession of by the administrator, or appraised as a part of his estate, and this witness being asked the reason why, states, that Peter Bland had told him, that in his opinion, the division was unfair, and that he should move the court for a new division, and this the witness stated to the appraisers. Whether the whole of the slaves, which were of the estate of Theodorick Morrison, remained on the plantation, or only those allotted to Gregory and wife, does not appear. They were all there at the allotment; no delivery was made by the commissioners who had no right to deliver them, but having made the allotment, left them where they found them. There is no proof, that any of them were ever taken possession of by Bland, after the allotment. On the death of Stith Gregory, those thus allotted to him and his wife, were either his property, and ought to have been taken possession of, by Sylvanus Gregory, his administrator ; or, the right to a fair dividend, as claimed in the bill aforesaid, or a confirmation of that already made, survived to the wife, such survivorship not being taken away by the decree and proceedings aforesaid, or that right passed to the administrator of Gregory. It is stated in the answer of Marks in this suit, that this right was claimed by, and in behalf of the wife; and that even the present complainant, Harrison, then acting as her agent, claimed them as her’s, and hired them out for her benefit; and a witness, Alfred Wilkins, proves, that in 1808, he hired one of them from complainant, as agent of Mrs, Gregory, and gave his bond to her.
Thus situated, the wife claiming by survivorship against the administrator of the husband, they continued until June, 1807, when Sylvanus Gregory, administrator of Stith Gregory, filed his bill in the county court of Prince George, in which he reters to the proceedings in the suit *377 by Gregory and wife aforesaid ; alleges, that the report bad been signed by the commissioners, but that Stith Gregory had died before it was returned and confirmed; and prays, that it may now be received and confirmed in the same manner, and have the same validity, as if it had been done in the iifc-timo of said Gregory, &c.; thus claiming the right to the slaves so allotted, as part of the estate of his intestate. This report, which the commissioners never had returned in the suit to which it belonged, and which suit was then depending, not having even virtually abated by the death of the husband, unless this claim of the administrator is well founded, is made an exhibit with this bill, having been obtained, whether properly or not, may perhaps be worthy of consideration, from that commissioner who had the custody of it.
To this bill, the administrator, Bland, and Mary Gregory, the widow, are the only defendants.
There is no allegation in this bill, that possession had been delivered to Stith Gregory, except that it states that the commissioners proceeded to make distribution as directed by the decree. It is filed solely on the ground, that the report ought, now to be received and confirmed in this suit, so as to have the samo eifect as if Gregory was alive. It is, therefore, a bill brought simply to carry into effect an interlocutory decree made in the other suit, on the ground, that the husband’s rights having attached to the subject, his rights, and not those of the wife, were now to be enforced ; and, consequently, that the suit, by husband and wife, must be considered as abated, there being no right surviving to her which could continue its existence as to her.
Had the right, and consequently the suit, survived to the wife, the report ought to have been returned by the commissioners in that suit, to be excepted to. confirmed, or rejected, and another division ordered, as to the court might seem proper ; and even if a jest division was made, it would only be confirmed, and possession delivered, so *378 ag to divest the possession and title of the administrator, on Ids getting the bonds directed to be given in the decree. Even bad the report been returned by the commissioners, either before or after the death of Stith Gregory, and filed in that cause, shewing that they had finally decided the matter confided to them, it would not have been confirmed, and possession delivered, until the bonds were given; but, in reality, no report lias ever been returned» and perhaps never finally agreed on by the commissioners ; and, until returned, I apprehend, cannot be considered as a report made, to any court; so that it may bo well questioned, whether the suit of Gregory and wife is to be considered as standing in any other or better plight than it stood, when the interlocutory decree was pronounced, and as if no division had been attempted by the commissioners.
To this bill, however, filed by the administrator of Stith Gregory, as aforesaid, without ever making the infant distributee a party, but considering the allotment final as to her, Bland, the administrator of Morrison, and who was guardian-ací litem of that infant, in the suit by Gregory and wife, answers. He says, that the division alleged to be made by the commissioners, ought not to be established. 1. Because, neither the bond to secure to him the 129f. 5s. 6(I., nor the refunding bond, had ever been executed to him by Stith Gregory j and which 1291. 5s. 6cl., is now necessary to pay debts and charges. 2. That he had hired out the slaves; and that a few days before the year expired, Stith Gregory, without his knowledge, unlawfully possessed himself of them, and had them divided, in an unjust manner, in his absence, and without notice to him, having the prime and most valuable slaves assigned to his wife : that he would have filed bis exceptions sooner, but the report never was returned, and he never bad a view of it until the day before his answer, viz : 21st September, 1807 : And the commissioners, being long before apprised of his objections, had pro *379 bably held it up for consideration, and to give him an op portunity to be heard. That, since, the interlocutory decree was entered, claims have come against him, as administra- * . ... . tor of Morrison; which, if supported* will make it necessary for him to hold on upon the slaves; and, therefore, they ought not to go to the creditors of Stith Gregory. He also submits, whether the infant, Ann Morrison, ought not to be a party.
In June, 1808, Mary Gregory, the widow, files her answer. Being not so well informed on the subject of controversy as Peter Bland, she refers to his answer as a part of her’s. She. insists upon her absolute right in the slaves, after the debts of her first husband, Morrison, are fully discharged ; and that Stith Gregory, in his life-time, never considered any legal division had taken place.
Some of the commissioners are examined in this case, who say they do not know that Bland had notice when the division was made ; that he was not present, and that they never returned their report. One of them saw it in possession of Sylvanus Gregory, the administrator.
Sylvanus Gregory died in July, 1810, and of course this suit abated.
In May, 1811, Wm. Harrison is appointed guardian of Ann Morrison. In September, 1811, Wm. Harrison, I presume the same man, takes administration de bonis non of the estate of Stith Gregory. And, in May, 1812, instead of reviving the suit last mentioned, he institutes this one in the chancery court of Richmond, against Nathaniel Marks, administrator of John Marks, and Peter Bland. In his bill, he takes no notice of the suit brought by Sylvanus Gregory, as aforesaid. He sets out the friendly bill, answer, &c. in the case of Stith Gregory and wite. He alleges, that the commissioners allotted the negroes, as directed by the decree, and actually delivered the share allotted to Mrs. Gregory, to her husband, who continued in possession for eighteen months: that, after his death, Mary, his widow, intermarried with John Marks ; and *380 though a marriage settlement had been made between them, renouncing, by him, all title to her estate, yet, he UP that paper and destroyed it, and set up a claim to the negroes allotted to her, as her absolute property: that, as the division was a fair and proper one, and was prevented from being confirmed by the omission or carelessness of the commissioners, in not returning their report, and as they had delivered the slaves to Stith Gregory, and as the claim of Marks is out of the question, not only because of the marriage agreement, but because the report of the commissioners, if at all effectual, vested the property in Stith Gregory, he prays that an attested copy of that report may be received, and established in like manner, as if it had been confirmed in Stith Gregory’s life-time. He makes Ann Morrison also a party, if the court thinks her a necessary party ; prays for a discovery of the issue of the slaves, a delivery of them by Edward Marks, administrator de bonis non of John Marks, Nathaniel having died before filing the billi and an account of hires, &c.
It is not stated, whether Mary, the wife of John Marks, formerly Mary Gregory, survived her last husband, or not, or whether she is now alive, or whether she left children, either by Marks or Gregory. Neither she nor they, if alive, are made defendants.
This bill claims, that the commissioners allotted, in absolute right, Phillis, and her five children, Dick, Billy, James, Mary, and Winney; old Frank, old Peter, and Milly. But the commissioners’report mentions Robin: whether he afterwards died, and when, or whether this is a mistake in the report, does not appear; nor is there any thing stated on that subject. It is probable, he died after the alleged division.
Edward Marks, administrator de bonis non of John Marks, demurs to the bill, because there is a clear remedy at law. He also relies on the act of limitations ; and, for further answer, says, that there was a marriage settle *381 ment, as alleged in the bill ; does not believe the slaves were delivered by the commissioners, or they would been taken possession of by the administrator of Stith Gregory, whereas they were retained by his widow : submits, whether th e court will take jurisdiction of a cause which is depending in an inferior court, of competent jurisdiction ; and that any person claiming benefit under the interlocutory decree of Prince George court, ought to resort to that court: believes, that Peter Bland withheld his consent to the delivery of the slaves to Stith Gregory, until a refunding bond was given, which has never been given ; and that the commissioners, therefore, refused to deliver them: that, from the death of Stith Gregory, until the intermarriage of bis widow with John Marks, the complainant, as agent for Mrs. Gregory, always claimed the slaves as her absolute property, and constantly hired them out for her benefit. In an amended answer, he states that the marriage contract is found. That contract is filed, and bears date in October, 1809 j speaks of a marriage about to take place: that she is possessed, in her own right, of a number of slaves, as by the list annexed, (there is no such list,) and that a portion of them, notwithstanding the marriage, is to be, and remain her property, and to be disposed of as she thinks proper; others to be for their joint benefit during life, and then to be bis property. She then conveys to Edward Marks and Nathaniel Marks the following negroes: Phillis, Dick, Billy, Milly, Winney, and Sally, and their increase, Kcc. (five of whom are the same names mentioned in the commissioners’ report, and are probably the same slaves, and Sally may be a child of one of them.) They are to be held in trust for husband and wife, during their lives, and then one moiety of them as she shall appoint by will or deed ; and, in default thereof, to her children, in equal portions, and the other moiety to bis children, in equal portions. Now, if these slaves were her’s, and if she is alive, she lias the use of them; if dead, and she *382 C',il(lren by Stitb Gregory, or Marks, or both, those children, together with her daughter, Ann, by Morrison, have a claim under the contract, and are, therefore, interested in settling this question, whether the property was her’s, or not ; and yet, neither she, if alive, nor her trustees, or her children, by Gregory or Marks, are parties to this suit. Her children, if any, by Stitb Gregory, may be interested, if he did not die much in debt, that the whole slaves should go to his administrator, as that in fact would be giving them the slaves; but, otherwise, if they would be taken to pay his debts. How this is, or what claim they will make, we know not.
Ann Morrison intermarried with James Young; and he and his wife file their answer. They object to the division, as being without authority, or consent. They submit, whether the proceedings in the suit referred to in the bill can be of any validity, and whether the interlocutory decree is binding, as they conceive it was made without authority, or consent. They consider themselves materially interested in the decision, and expect their rights to be protected. They state, that a marriage settlement was made by Marks; and'conceive it was made as well for the benefit of the said Ann, as for the. other daughter of Mary Gregory, (so it would seem she probably has a daughter by Gregory.) The respondent, Ann, says she is still under age. They blame Bland, as administrator, for not rendering any account, or making any settlement of the estate, and for suffering the slaves to be divided in an unusual manner, and to go out of bis possession, without endeavoring to prevent it, into the possession of those indebted to the estate, without taking from them any security, &c.
This answer is sworn to in October, 1816, in Peters-burg, though they say they reside, in North Carolina. ,
There is a paper thrown in, but without date, by A. B. Spooner, attorney for Young and wife, in which they waive any benefit from the decision in this cause, provided, *383 the division made by the commissioners be confirmed. Is it competent for an attorney to waive or release the rest of his clients, insisted upon in their answer, more es-1 > . Ticckilly of a feme covert, and she an infant (b) Can this paper, therefore, be noticed r
Peter Bland, the administrator of Morrison, answers this bill. lie admits the proceedings in the suit of Stith Gregory and wife, says now he believes the division was fair and equal, though made in his absence; and, therefore, waives every exception, which lie might otherwise have thought it his duty to make; nor does he think it material, that it was not returned in the life-time of Stith Gregory; but says, tlsat the terms on which he, as administrator, agreed to the division, were, that he was to be paid about 129k 5s. 6d., of which no part has been paid ; and this was made a condition in the decree, and he insists on the payment of this sum, with interest, or that a sufficient number of the slaves, be sold to pay it. On this payment being made, he has no objection, as far as he is concerned, to the prayer of the bill, but not otherwise, because it would be unjust to give the plaintiff the benefit of a decree, without performing the just conditions on which alone that decree was rendered.
This answer is sworn to the 13th January, 1815.
William IL Harrison, a witness in this case, proves, that the report of the commissioners was filed with the bill of Sylvanns Gregory.
James Dunn, one of the commissioners, says, that to the best of his knowledge, Phillis and her five children, Dick, Billy, James, Mary, and Winney, old Frank, old Peter, and Milly, were allotted to Stith Gregory and wife, as their absolute property, and were left In his possession, and remained in his possession sixteen or eighteen months, (but it is proved that he died about a year alter,) and until his death, were considered as his property ; (jlobin is omitted by him, and his name is in the *384 report 0 That the division was made on the plantation, where Morrison died, and where Gregory and wife lived, and that no possession was given to Gregory by the commissioners. In May, 1817, the suit abated by plaintiff's 5 and at November rules 1817, was dismissed, as to James Young, and Ann his wife, as defendants, and scire facias awarded to revive ugaivst James Young, administrator de bonis non of Stith Gregory. I presume it was intended (o revive it in his name. There is no order to revive the suit in the name of Young, nor any proceeding after he is recognised as the administrator de bonis non of Stith Gregory, except the taking of Dunn’s deposition.
The parties named in the caption of the decree when the cause was finally heard, were James Young, administrator, &c. of Stith Gregory, plaintiff, against Edward Marks, administrator, &c., and Peter Bland; but in fact, there was no plaintiff, and the suit had never been revived.
This case, then, presents this extraordinary spectacle. On the deatli of Stith Gregory, and for a long time after, the right in her portion of those slaves was claimed by the. widow as surviving to her. That claim w7as asserted, on her behalf by Harrison, who hired them out as her’s. It was asserted by Bland, the administrator of her former husband, and guardian ad litem of his infant. It was also asserted by Young and this same infant, his wife, codistributees w7ith her; and yet this same Harrison, as administrator de bonis non of Stith Gregory, filed this bill to disaffirm her rights. Bland contradicts his former answer, and is willing to surrender her rights, if he himself is made safe, but not otherwise ; still insisting on the invalidity of the proceedings, as to himself and Young, is now actually the plaintiff, though not regularly so, asserting a claim against the alleged interest of himself and wife, in their answer in this suit, which in fact, is dismissed at rules as to them, not by order of the court, so that that interest is not now before the court. It may be, that *385 Mrs. Marks is dead, and that she left no children by her last husband, who are interested in asserting her rights, or their own, under the marriage contract: and that her only children may be Mrs. Young, and a daughter by Gregory, and that by some arrangement between them, it may be now most to their interest, that the administrator of Gregory should recover; but this court cannot enter hito views of this kind, if they exist. We must take up the subject at the death of Stith Gregory, if the property was so reduced to possession by him, that no right survived to his wife, the case is at an end. The affirmative of tin's proposition, however, it appears to me, cannot be decided in the situation in which the cause now stands, as to parties. If the negative of it, however, can be maintained, it is not necessary to enquire as to other parties, as in no event can the plaintiff prevail.
On the marriage of Mary Morrison with Stith Gregory, her rights in the slaves of her first husband were those stated in the bill filed in Prince George court; and we must enquire into the effect of the proceedings in that court, on those rights.
The courts of equity in England, have adopted a course of decision in regard to the equitable interests of femes covert, by directing settlements to be made by the husband, which, as yet, have never been acted upon by our courts. Whether they ever will be, is not for me to say at present j if it is, or may bo a legitimate and proper course of decision, we ought to do nothing that may impair it. It is not necessary, however, to resort to the principle in question, in the present case, although that principle will tend to explain some of the cases referred to, in the argument. Thus, in a short case in 3 Br. C. R. 362, it is said, that if money be ordered to be paid to the husband in right of his wife, and he dies before payment, it will be ordered to be paid to his executor. This, I apprehend, was a case similar to that in 4 Yes. 15, in which it is said, that if a settlement is reported, approved and ordered by the *386 cour^i ^ ought perhaps to be binding, notwithstanding the death of either party, before it is carried into efleet; but, it is there expressly laid down, that, if it has not been approved, the right survives to her. Or, this case may have boon orte> arising under the doctrine laid down in 2 Yes. senr. 677, where it is said, that if the action vests after marriage, the husband may dissent to the wife’s interest, and recover in his own name; and such recovery, is equal to reducing to possession. But, there the general doctrine is also explicitly stated, that if in such case, he sues in the name of husband and wife, the judgment will be, that both recover, and then the surviving wife, and not the executor of the husband, shall have the scire facias on the judgment.
The general doctrine is also laid down in Co.Litt. 3SI, in the note, that if Baron and feme have a decree for money in the right of the wife, and then the Baron dies, the benefit of the decree belongs to the feme, and not to the executor of the husband.
From all this, it results, that where there is a suit, by husband and wife, in right of the wife, even if there is a judgment or decree, but the money or thing not received under it, it survives to the wife, except, in England, where the husband may have been delayed by reports, &c. As to settlements, if those arrangements are approved, they then assume something of the nature of contracts, the wife is generally examined by the chancellor, and they are afterwards confirmed in favor of the husband. But, when there is no final judgment or decree, the wife is not even put to her scire facias, or new suit ; for, the suit does not abate by the death of the husband. But, it may be said, that the property being left in possession of the husband, as aforesaid, this either actually or virtually abated the suit as to both, on the death of the husband: that, if it was not actually abated as to the wife, and she had gone on to have the division confirmed, or to have had a new one made, (which must necessarily have been the result, *387 on an exception by Bland, as administrator and guardian ad litem, stating that he had no notice of the division, and that it was ex-parte and unequal,) yet the executor of the husband could have filed his bill to prevent the widow from going on with the suit, or to have the benefit of the decree that might be made in it, in the same manner as if the husband were alive.
I doubt exceedingly, whether this could have been done. I think certainly it could not, according to the course of decision in England.
The general doctrine laid down in 4 Ves. 19, is, that an assignment, even by the husband, of the wife’s equitable interest (which is one mode by which he may reduce her legal rights to possession,) will not bar the equity of the wife. It woxdd be strange if it did, since the decisions at law, that the husband cannot maintain an action therefor a legacy due to his wife, for that would totally defeat the wife’s equity; an assignment, therefore, of such equity, will not put the assignor in abetter situation than the husband is in at law. It must, of course, survive entire to her. But, the possession in this case was at most a social possession, even if only those slaves set apart for the wife remained in his possession; for, until the final decree produced a severance, he could not claim any individual slave as the property of his wife. Suppose any of them had died, either of those allotted to the wife or the child, after the alleged division, and before it was confirmed, must there not have been a new division, so as to make the division just at the time the decree was made, and the title vested ? This probably happened as to Robin. It must also be considered a fiduciary possession ; otherwise, it would be a fraud on the decree, and on the administrator, whose title and possession were not divested by this proceeding. He was to be secured in a large sum of money, and to be further indemnified, before he would assent to part with his possession, and before he could be deprived of it even by the court; and he even *388 now claims to hold on upon them. He could have sold * for payment of debts, and the purchaser would have held a good title, and the court would have enjoined the husband, if he had attempted to prevent such sale. But ^ would have been far otherwise, if the husband had acquired title in the property, by the voluntary surrender or distribution thereof by the administrator $ or, if they had been vested in him by the final decree, on his giving the bonds required.
In these cases, the administrator could not sell the property itself, his title being gone, but be must resort to the husband for indemnity, in case of after-debts, &c. The title, then, was not in the husband, but in the administrator, (I apprehend it could not be in both,) and unless the court would permit the proceedings of the husband, under their decree, to operate a fraud on that decree, and on the administrator, his possession must be considered the possession of the administrator, or of the commissioners, until final decree, and bonds given. It may be said, that Bland, the administrator, did not make fresh pursuit and claim, and, therefore, waived bis right: When he made known his dissent to the division, does not appear, probably very soon, as otherwise the report would have been returned$ but the property was in the custody of the law', his title could not be affected by the proceedings of the commissioners, or Gregory under the decree, and no one pretended to interfere with the property, except under the decree, and subject to it. Indeed, never having seen the report, he might well have thought it improper to interfere, until it was returned to court; and as he has, at all times, insisted on the payment of the money due to him, and as about this time, other claims were coming against the estate, his willingness that the title should pass from him, before these matters were provided for, can be presumed. Suppose the husband had, on the next day after this alleged division, dismissed the suit, and sold the slaves, would the purchaser have taken a title in them as *389 the wife’s property reduced to possession by him ? I think not, but that the administrator could have recovered them from the purchaser, and then, on the death of the husband, nothing further being done, they would surely have survived to the wife. If the division, and retaining the possession after it, did not instantly vest the title in the husband, but was then in the administrator, for the purposes of paying debts, and distribution, when did it vest in the husband? And even, if he had dismissed the suit as aforesaid, or had never brought one, but had got possession of all the slaves, as husband, would this vest a title in him ? For, although the wife had an interest in the whole of them, yet until a division was made, she had no right to any individual or individuals of them ; how then could the husband reduce to possession as her properly, any particular portion of them ? Had they all been delivered over to him by the administrator, to hold them on behalf of his wife, and her child, to whom they belonged, the administrator thereby divesting his title, yet in this case, he would hold no particular portion of them as her’s, which he could sell, and I doubt whether in this case he could bring a suit in his own name, without joining his wife, for a division: if he could not, and I can find no case justifying an opinion that he could, then certainly his executor could not. But if he could, that is a very different case from the one before us.
Here the suit is to get possession, and to get it in severalty, and lie dies before they are severed. His rights must be considered as at the time of his death $ they cannot become stronger by posterior acts of any of the parties. If the right and suit survived to the wife, she had a right to a final division and allotment to her as survivor : if she and her daughter agreed to let the former allotment stand, or if she held that portion allotted to her, until her daughter came of age, or some other division was demanded, it does not follow that she is to be considered as claiming under her husband. Her claim *390 ^iem as ^ier property, surviving to her, was at all times asserted from the moment she could make such claim, and she cannot be deprived of that title, by her daughter’s failing to assert a right to any other division, or now abandoning her right to it. This abandonment, too, if the attorney could make it, is only made on condition, that the division in question should stand, so as to enure to Stith Gregory’s administrator. It is in these words : “ The defendant Young, and wife, waive all benefit to be derived from the decision of this case, provided, the division made by the commissioners, shall be decreed to stand, and be binding. It is not their desire to dispute the right of Stith Gregory to the slaves which he had in possession.” Signed by their attorney.
Can this conditional abandonment vary the rights of the parties, as they stood at the death of Stith Gregory ? Suppose that abandonment had not been made, could we say that this division, made eoc-parte, and never returned, must stand good against one who is not only an infant, but a feme covert ? and if this court shall not think proper to decree according to the terms stipulated for in this paper, what is to become of the rights of this party, and how is she again to be brought into court ? Can the abandonment of the rights of the wife by the administrator, although formerly asserted in her favor, change the nature of those rights ? But, even he too abandons them, only on proviso that he can be secure himself. This strange shifting of the scenes, I perhaps might account for, were I behind them. It may be, that there is some apprehension that the creditors of Marks, in consequence of the marriage settlement not being recorded, may take the property ; or, that if Gregory’s administrator recovers, a division may take place, between his daughter, and Ann Young, more advantageous to them than they can expect, under the marriage agreement; but, how Gregory’s creditors can recover, until all parties claiming under that agreement, are before the court, I confess I cannot see.
*391 If, upon the filing of the bill of Sylvanus Gregory, and the answers thereto, the court had taken up the original cause to which they referred, and had set aside the report, v-7 »• t i as being made ex-parte, and •without notice, had re-committed the division to the same, or a new set of commissioners, and had finally made division between the mother and daughter, upon the mother securing the debt due from her to the administrator, Bland, &c., and had dismissed the bill of Gregory’s administrator, ought such decree to have been reversed here ? I think not; or, if that suit had been revived by the administrator de bonis non, as would have been the regular course, in order to carry on that claim, and such final decree had been pronounced in the first suit, 1 think it ought not to have been disturbed. This course, doubtless, was not pursued, because Bland, who was a party to that suit, had answered, and would hardly have been permitted, had he been willing to file a new answer, expressly contradicting his first. The wife also would have been a party.
But let us suppose, that the slaves of the wife had bceu of less value, than the debt due from bet* to Bland, could she or Bland have sued Gregory’s administrator, to compel him to take those slaves and pay that debt, to indemnify Bland the administrator, further than that, and to the extent of any thing else, which the wife may have received, as she did receive something else, from the personal fund ? But, Gregory must have done this, even if the property had been of less value, had the decree been made final in his life-time. But this debt, and the right to this indemnity, survives, I presume, against the wife. The bonds which would have placed these responsibilities on the husband, were never given; and if the title vested in the husband without them, are they new to he given by his administrator; or,is he even bound to pay this debt due from the wife, out of Gregory’s estate ? How is Bland to he secured ? If the title is in Gregory, he may follow the assets perhaps, for the payment of the debts of his intes *392 fate: but can he follow them for a debt due to himself, from the wife of his intestate ? And if he can, and fails, can he .recover of her after depriving them both, by this shifting of character, of the fund from which it ought to be paid ? The administrator of Gregory, has neither offered to pay this debt, or to indemnify; and from the pointed manner in which Bland insists on this, without which he will not consent to a decree in his favor, I suppose this is a matter which has not been arranged amongst them. If it had been foreseen to be a difficulty in the way, doubtless it would. But, can the court compel the administrator, to give his individual bonds, or apply these assets, to the payment of this debt ? There may be debts of superior dignity to he first paid.—These doubts, if there is any thing in them, may tend to shew, that the bonds provided for in the decree, w'ere necessarily to precede the change of title in the property; and that the rights of the parties are not to be decided by posterior events, or waivers, or agreements of some of the parties ; but that the inquiry in fact is, what decree ought to have been pronounced in the original suit, on the facts and under the circumstances existing at the death of Sfith Gregory ? How far a possession by a husband, under an interlocutory decree, agreed to, and acquiesced in by an executor and administrator, and all parties concerned, shall be considered a reduction of the property to possession, so as to vest it in the husband and his representatives, will be proper for consideration, when such case is presented.
On the w'hole, though not .without some difficulty, arising from the involved and perplexed state of the case, I think the decree must be affirmed.
Judge Cabell
was of opinion, that the decree should be reversed, and Judge Brooke was of opinion, that it should be affirmed. The court being divided, the decree of the chancellor was affirmed.
*393 The following was entered as the decree of the court.
The court, not approving of so much of the chancellor’s decree, as disclaims jurisdiction on the ground, that the plaintiff ought to have sued at law, is of opinion to ailirm the decree.

 Old R. C. of 1792. chap. 76, see. 10. 2 Saund. 63, n. notes.

 Herbert vs. Alexander, 2 Call, 502.